**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | | |
|---|---|---|
| LISA D. GARZA, | ) | No. ED CV 11-685-PLA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on April 29, 2011, seeking review of the Commissioner's denial of her application for Disability Insurance Benefits.  The parties filed Consents to proceed before the undersigned Magistrate Judge on May 25, 2011, and June 1, 2011.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on February 1, 2012, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on April 8, 1974.  [Administrative Record ("AR") at 74, 78.]  She has a high school education and past relevant work experience as an administrative assistant.  [AR at 150, 154.]

On December 6, 2007, plaintiff filed her application for Disability Insurance Benefits, alleging that she has been unable to work since November 30, 2004, due to fibromyalgia, hypothyroidism, vertigo, migraines, fibrocystic breast disease, and restless leg syndrome.  [AR at 74, 78, 133-35, 148-55.]  After her application was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  [AR at 79-94.]  A hearing was held on February 4, 2010, at which time plaintiff appeared with counsel and testified on her own behalf.  [AR at 28-65.]  A medical expert and a vocational expert also testified.  [AR at 39-43, 53-64.]  On February 25, 2010, the ALJ determined that plaintiff was not disabled.  [AR at 17-24.]  On March 4, 2011, the Appeals Council denied plaintiff's request for review.  [AR at 1-5, 11.]  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257.  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th

2

1  Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the Court

2  must defer to the decision of the Commissioner.  Moncada, 60 F.3d at 523; Andrews v. Shalala,

3  53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

4

5                                                **IV.**

6                                **THE EVALUATION OF DISABILITY**

7          Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

8  to engage in any substantial gainful activity owing to a physical or mental impairment that is

9  expected to result in death or which has lasted or is expected to last for a continuous period of at

10  least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

11

12  **A.      THE FIVE-STEP EVALUATION PROCESS**

13          The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

14  whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

15  828 n.5 (9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must

16  determine whether the claimant is currently engaged in substantial gainful activity; if so, the

17  claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

18  substantial gainful activity, the second step requires the Commissioner to determine whether the

19  claimant has a "severe" impairment or combination of impairments significantly limiting her ability

20  to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

21  If the claimant has a "severe" impairment or combination of impairments, the third step requires

22  the Commissioner to determine whether the impairment or combination of impairments meets or

23  equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404,

24  Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.

25  If the claimant's impairment or combination of impairments does not meet or equal an impairment

26  in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

27  sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled

28  and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to

1  perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a

2  prima facie case of disability is established.  The Commissioner then bears the burden of

3  establishing that the claimant is not disabled, because she can perform other substantial gainful

4  work available in the national economy.  The determination of this issue comprises the fifth and

5  final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828

6  n.5; Drouin, 966 F.2d at 1257.

7

8  **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

9        In this case, at step one, the ALJ concluded that plaintiff has not engaged in substantial

10  gainful activity since her alleged disability onset date, November 30, 2004.  [AR at 19.][1]  At step

11  two, the ALJ concluded that plaintiff has had the severe impairments of fibromyalgia as of January

12  1, 2006, and a disorder of the cervical spine as of January 1, 2007.  [Id.]  At step three, the ALJ

13  determined that plaintiff does not have an impairment or combination of impairments that meets

14  or medically equals any of the impairments in the Listing.  [AR at 20.]  The ALJ further found that

15  plaintiff "was without any functional limitations" from November 30, 2004, to December 31, 2005,

16  but that from January 1, 2006, to December 31, 2006, plaintiff retained the residual functional

17  capacity ("RFC")[2] "to lift and carry 20 pounds occasionally and 10 pounds on a frequent basis

18  without limitation in regard to sitting, standing or walking."  [Id.]  The ALJ also found that from

19  January 1, 2007, until the date of the decision on February 25, 2010, in addition to the lifting and

20  carrying restrictions, plaintiff was also "limited to occasional work above shoulder level with her

21  upper extremities."  [Id.]  At step four, the ALJ concluded that plaintiff is capable of performing her

22  past relevant work as an administrative clerk.  [AR at 23.]  Accordingly, the ALJ determined that

23  plaintiff was not disabled from November 30, 2004, through the date of the decision.  [AR at 24.]

24

25  _____

26        [1]    The ALJ concluded that plaintiff meets the insured status requirements of the Social
     Security Act through December 31, 2009.  [AR at 19.]

27

28        [2]    RFC is what a claimant can still do despite existing exertional and nonexertional
     limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

**V.**

**THE ALJ'S DECISION**

Plaintiff contends that the ALJ improperly: (1) rejected the opinions of plaintiff's treating physician and an examining physician, and (2) discounted plaintiff's credibility.  [Joint Stipulation ("JS") at 5-6.] As set forth below, the Court agrees with plaintiff and remands the matter for further proceedings.

**A.    TREATING PHYSICIAN AND EXAMINING PHYSICIAN OPINIONS**

Plaintiff contends that the ALJ improperly rejected the opinions of plaintiff's treating physician and an examining physician.  [JS at 6-15.]

In evaluating medical opinions, the case law and regulations distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians).  See 20 C.F.R. §§ 404.1502, 404.1527, 416.902, 416.927; see also Lester, 81 F.3d at 830.  Generally, the opinions of treating physicians are given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant.  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  Despite the presumption of special weight afforded to treating physicians' opinions, an ALJ is not bound to accept the opinion of a treating physician.  Where a treating physician's opinion does not contradict other medical evidence, an ALJ must provide clear and convincing reasons to discount it.  Where a treating physician's opinion conflicts with other medical evidence, an ALJ may afford it less weight only if the ALJ provides specific and legitimate reasons for discounting the opinion.  See Lester, 81 F.3d at 830; see also Orn, 495 F.3d at 632-33 ("Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's

1   opinion is 'still entitled to deference.'") (internal citation omitted); Social Security Ruling[3] 96-2p (a

2   finding that a treating physician's opinion is not entitled to controlling weight does not mean that

3   the opinion is rejected).  "The opinion of an examining physician is, in turn, entitled to greater

4   weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830.  As is the case with

5   the opinion of a treating physician, the ALJ must provide "clear and convincing" reasons for

6   rejecting the uncontradicted opinion of an examining physician, and specific and legitimate

7   reasons supported by substantial evidence in the record to reject the contradicted opinion of an

8   examining physician.  See id. at 830-31.

9        The record shows that Dr. Dawn A. Hnat, a rheumatologist [see AR at 651], first saw

10  plaintiff as early as October 31, 2007, and saw plaintiff monthly between February and October

11  2008, and every couple of months between October 2008 and October 2009.  [See AR at 209-10,

12  263-64, 432-33, 552, 557-58, 562-63, 575-76, 581, 586-87, 590-91, 612-13, 674, 680, 689-90,

13  696-97, 701.]  On October 31, 2007, Dr. Hnat noted that plaintiff had been "diagnosed with

14  fibromyalgia in approximately 2006."  [AR at 432.]  She performed a neurological examination on

15  plaintiff, from which she found that plaintiff had "marked dysesthesias[4] over her entire body," and

16  "tenderness at all fibromyalgia tender points[;] ... even light touch elicits severe pain."  [Id.]  Dr.

17  Hnat also noted that plaintiff had "difficulty sleeping and ... wakes unrested," and diagnosed

18  plaintiff with fibromyalgia with dysesthesias.  [Id.]  On February 4, 2008, Dr. Hnat again reported

19  that plaintiff was experiencing "severe fatigue," found that her extremities had "marked

20  fibromyalgia tenderness at all fibromyalgia sites," and again diagnosed her with fibromyalgia.  [See

21  AR at 612.]  Dr. Hnat also "referred [plaintiff] to the Pain Management M.D. to discuss whether

22  epidurals or other treatment would be helpful," and asked plaintiff to "begin Cymbalta 30 mg" and

23  follow up with her in two to three weeks.  [See AR at 612-13.]  On February 27, 2008, Dr. Hnat

24

25  [3]   Social Security Rulings ("SSR") do not have the force of law.  Nevertheless, they
    "constitute Social Security Administration interpretations of the statute it administers and of its
26  own regulations," and are given deference "unless they are plainly erroneous or inconsistent with
    the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

27

28  [4]   Dysesthesia is defined as: "an unpleasant abnormal sensation produced by normal stimuli."
    Dorland's Illustrated Medical Dictionary, at 553 (29th ed. 2000).

6

noted that plaintiff "was seen by a pain specialist who did not feel that the cervical spine changes were the cause of her pain" and that plaintiff "was given a trial of Cymbalta but had an allergic reaction and discontinued it." [AR at 590.]  Dr. Hnat again reported that plaintiff experienced "persistent diffuse severe pain and fatigue," found that plaintiff had "[m]arked tenderness at all fibromyalgia tender points," and diagnosed her with fibromyalgia. [See AR at 590-91.]  She also prescribed Zoloft to plaintiff. [See AR at 591.]  On plaintiff's next visit, on March 26, 2008, Dr. Hnat reported that plaintiff "tried the Zoloft, but did not notice any improvement and instead had headaches, which resolved after she discontinued it," and found that she had "[p]ositive fibromyalgia tender points at all sites." [AR at 586-87.]  On May 7, 2008, Dr. Hnat reported "[m]arked tenderness at all fibromyalgia tender points," diagnosed her with "[f]ibromyalgia--very severe," and started plaintiff on Effexor, from which plaintiff developed multiple side effects and which she thus discontinued. [See AR at 575-76, 581.]  Thereafter, on June 11, 2008, July 17, 2008, August 6, 2008, September 22, 2008, October 30, 2008, January 19, 2009, March 2, 2009, July 6, 2009, September 2, 2009, and October 28, 2009, Dr. Hnat consistently found that plaintiff had marked tenderness at all fibromyalgia tender points, noted that plaintiff was experiencing severe fatigue, and diagnosed her with severe fibromyalgia. [See AR at 209-10, 263-64, 552, 557-58, 562-63, 575-76, 674, 689-90, 696-97, 701.]  On October 30, 2008, Dr. Hnat completed a Fibromyalgia Impairment Questionnaire for plaintiff, in which Dr. Hnat stated that plaintiff meets the American Rheumatological criteria for fibromyalgia, and that plaintiff's clinical findings included positive fibromyalgia tender points at all fibromyalgia sites and hyperesthesia[5] throughout. [See AR at 646-51.]  Dr. Hnat also reported that plaintiff has pain in her lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, arms, hands/fingers, hips, legs, and knees/ankles/feet, that her pain is "constant," and that its severity is 9 to 10 on a scale of 1 to 10. [See AR at 647-48.]  Dr. Hnat listed at least 25 medications that plaintiff has tried and stated that "[a]ll med[ication]s [were] ineffective or caused side effects." [See AR at 648.]  She opined that plaintiff can only sit

---

[5]    Hyperesthesia is defined as: "a dysesthesia consisting of increased sensitivity, particularly a painful sensation from a normally painless touch stimulus."  Dorland's Illustrated Medical Dictionary, at 850.

for 0 to 1 hours and can only stand or walk for 0 to 1 hours in an 8-hour day, that she can only occasionally lift or carry 10 pounds and can never lift more than that, that she is incapable of even "low stress" jobs, that she would need to take several unscheduled breaks of 10 to 20 minutes in an 8-hour workday, and that she would likely be absent from work more than three times a month due to her impairments.  [See AR at 649-50.]  In a letter dated December 7, 2009, Dr. Hnat reiterated many of her statements and opinions included in the October 30, 2008, Fibromyalgia Impairment Questionnaire.  [See AR at 654.]

On December 22, 2009, Dr. Jens W. Dimmick, an internal medicine physician [see AR at 729], examined plaintiff, found that she had "multiple tender areas in the large extensors and flexors of the upper and lower extremities," and reported that his clinical findings for plaintiff included "[m]ultiple tender trigger points."  [See AR at 706-19.]  Dr. Dimmick diagnosed plaintiff with fibromyalgia and noted, based on a review of plaintiff's medical records, that her "doctors have tried all the various remedies that are recommended for fibromyalgia without any success." [See AR at 709-17.]  Dr. Dimmick opined that plaintiff has the functional capacity to "sit for a total of 5-6 hours [in an 8-hour day], with the ability to get up and move around for five minutes every hour," to "stand/walk for a total of 0-1 hours" in an 8-hour day, and to lift and carry "0-10 pounds occasionally and over 10 pounds never."  [AR at 718.]  He further opined that plaintiff "needs to take unscheduled breaks to rest hourly for 5-10 minutes during an eight-hour workday" and "is likely to be absent from work more than three times a month as a result of her impairments."  [AR at 719.]  In a Multiple Impairment Questionnaire Dr. Dimmick completed concerning plaintiff on December 23, 2009, he noted that plaintiff has unsuccessfully tried nonsteroidal anti-inflammatories and muscle relaxers, among other types of medications, as well as exercise and physical therapy.  [See AR at 722-29.]

Dr. Hnat's and Dr. Dimmick's opinions regarding plaintiff's work restrictions conflicted with those of a consultative examiner (Dr. Sean To), who opined that plaintiff has the RFC to perform

1    medium work[6] [see AR at 227-28], a state agency physician, who opined that plaintiff has the RFC

2    to perform light work[7] [see AR at 247], and the medical expert who testified at the February 4,

3    2010, hearing that plaintiff can perform light work.  [See AR at 43.]  Thus, the ALJ was required

4    to give specific and legitimate reasons for not assigning "controlling or any significant degree of

5    weight" to Dr. Hnat's opinion [see AR at 22], and for rejecting Dr. Dimmick's opinion [see AR at

6    23].  See Lester, 81 F.3d at 830.

7            None of the ALJ's reasons for rejecting Dr. Hnat's opinion were legally adequate.  First,

8    while the ALJ stated that plaintiff's complaints of pain were "primarily subjective in nature" and that

9    "other examiners have commented as to some embellishment of symptomatology" [see AR at 22,

10   229, 232-33], fibromyalgia is a syndrome that "is poorly understood within much of the medical

11   community," and "[it] is diagnosed entirely on the basis of patients' reports of pain and other

12   symptoms."  Benecke v. Barnhart, 379 F.3d 587, 590, 594 n.4 (9th Cir. 2004) (internal citation

13   omitted); see also Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996) ("[Fibromyalgia's] cause or

14   causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms

15   are entirely subjective.").  Courts have noted that there are no laboratory or diagnostic tests that

16   can confirm the presence of fibromyalgia.  Benecke, 379 F.3d at 590 (internal citations omitted);

17   Sarchet, 78 F.3d at 306; Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003).

18   Fibromyalgia is often diagnosed by eliminating other possible conditions and by confirming

19   "widespread pain with tenderness in at least eleven of eighteen sites [on the body] known as

20   trigger points."  See Brosnahan, 336 F.3d at 672 n.1; see also Rollins v. Massanari, 261 F.3d 853,

21   855 (9th Cir. 2001); Preston v. Sec. of Health and Human Servs., 854 F.2d 815, 818 (6th Cir.

22   1988).  Other symptoms of fibromyalgia include fatigue, disturbed sleep, and stiffness.  Rollins,

23   261 F.3d at 855 (quoting Sarchet, 78 F.3d at 306); Preston, 854 F.2d at 818.  Here, over a

24   _____

25   [6]   20 C.F.R. § 404.1567(c) defines "medium work" as work that involves "lifting no more than
     50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."

26   [7]   20 C.F.R. § 404.1567(b) defines "light work" as work involving "lifting no more than 20
27   pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and
     requiring "a good deal of walking or standing" or "sitting most of the time with some pushing and
28   pulling of arm or leg controls."

treatment period of more than two years, Dr. Hnat consistently reported that plaintiff experienced severe pain and fatigue, and had markedly tender points at all fibromyalgia tender points.  [See AR at 209-10, 263-64, 432, 552, 557, 563, 575-76, 581, 587, 590-91, 612, 674, 689-90, 696-97, 701.]  Thus, Dr. Hnat's opinions were based on her steady confirmation of the generally accepted symptoms of fibromyalgia -- severe pain, severe fatigue, and positive tenderness at all fibromyalgia tender points.  Moreover, as discussed infra, that an examining psychiatrist opined that plaintiff "appeared to embellish psychiatric symptomatology to some extent" [see AR at 232] was not a specific, clear and convincing reason for the ALJ to discount plaintiff's credibility as to her physical symptoms, and thus it also was not a specific and legitimate reason to reject Dr. Hnat's opinions regarding plaintiff's physical impairments and resulting functional limitations.

Next, the ALJ rejected Dr. Hnat's opinions because the ALJ found that while "Dr. Hnat reported that [plaintiff] had been on multiple trials of medications to which she had failed or had not tolerated, ... there is no indication that she went to the extent of referring [plaintiff] to a pain clinic or more aggressive treatment, such as trigger point injections."  [AR at 22.]  First, this statement by the ALJ is inaccurate, as Dr. Hnat referred plaintiff to a pain management physician on February 4, 2008, "to discuss whether epidurals or other treatment would be helpful," and reported on February 27, 2008, that plaintiff "was seen by a pain specialist who did not feel that the cervical spine changes were the cause of her pain."  [See AR at 590, 612.]  On February 7, 2008, plaintiff saw Dr. A.C. Nickolescu, who examined plaintiff, found tenderness in her knees, cervical back, and lumbar back, and opined that "[t]he reason for the ... pain[,] including neck pain[,] is related to her fibromyalgia."  [See AR at 596-97.]  While it is unclear from the record whether Dr. Nickolescu is the pain management physician to whom Dr. Hnat referred plaintiff, Dr. Nickolescu discussed narcotic pain medications with plaintiff, and plaintiff expressed to him that she did not want to be placed on narcotics for pain control.  [See AR at 597.]  Moreover, upon reviewing plaintiff's medical record, Dr. Dimmick noted on December 22, 2009, that plaintiff's "doctors have tried all the various remedies that are recommended for fibromyalgia without any success" [see AR at 717], which included at least 25 different pain medications.  [See AR at 648.]  Finally, while the ALJ noted trigger point injections as an example of "more aggressive treatment"

that Dr. Hnat did not refer plaintiff to, the ALJ pointed to nothing in the record to show that such treatment is a standard method of treating fibromyalgia. An "ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion[s]." Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks and citations omitted); see also Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (the ALJ should not have gone outside the record to medical textbooks for the purpose of making his own exploration and assessment as to the claimant's physical condition). Indeed, there is no evidence in the record from any physician that anything more could have been done that would have alleviated plaintiff's symptoms. Cf. Wilson v. Astrue, 2011 WL 1812501, at *6 (C.D. Cal. May 12, 2011) (that the plaintiff's treating physician did not refer her to a pain management program for nerve blocks, trigger point injections, and other aggressive treatment, where there was no medical evidence that such referrals were the standard method of treating fibromyalgia, did not constitute a clear and convincing reason to discount the plaintiff's subjective symptoms as to her fibromyalgia). For these reasons, the ALJ's second basis for rejecting Dr. Hnat's opinion was not a legitimate ground for doing so.

Third, the ALJ decided not to give Dr. Hnat's opinions "any significant degree of weight" because "[plaintiff's] descriptions of her activities throughout the record do not show that she is significantly limited by pain, fatigue or weakness." [AR at 22.] As discussed infra, however, the ALJ improperly discounted plaintiff's credibility on the ground that her daily activities did not support her allegations regarding the severity of her symptoms. Thus, inasmuch as Dr. Hnat's opinions were based on plaintiff's reported limitations in performing daily activities, this also was not a specific and legitimate reason to reject Dr. Hnat's opinions.

Finally, an ALJ may not properly reject a treating physician's opinion by merely referencing the contrary findings of another physician. Even when contradicted, a treating physician's opinion is still entitled to deference, and the ALJ must provide specific and legitimate reasons supported by substantial evidence for rejecting it. See Orn, 495 F.3d at 632-33; see also Rollins, 261 F.3d at 856 ("The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record.") (internal citation omitted); Hostrawser v. Astrue, 364 Fed.

Appx. 373, 376-77 (9th Cir. 2010) (citable for its persuasive value pursuant to Ninth Circuit Rule 36-3) (ALJ erred in affording nontreating physicians' opinions controlling weight over the treating physicians' opinions, where the ALJ did not provide a thorough summary of the conflicting clinical evidence and his interpretations thereof with an explanation as to why his interpretations of the evidence, rather than those of the treating physicians, were correct); SSR 96-2p. Specifically, the opinion of a non-examining physician may only serve as a basis to reject the opinion of a treating physician where the non-examining physician's opinion is consistent with other independent evidence in the record. See Ryan v. Comm'r of Soc. Sec. Admin., 528 F.3d 1194, 1202 (9th Cir. 2008) (quoting Lester, 81 F.3d at 831 (emphasis in original)) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician."). In contrast, "[a] report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record." See Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984) (quoting Millner v. Schweiker, 725 F.2d 243, 245 (4th Cir. 1984)).

As discussed above, Dr. Hnat saw plaintiff in October 2007, monthly between February and October 2008, and every couple of months between October 2008 and October 2009, performed physical examinations on plaintiff, and prescribed numerous pain medications to her. See 20 C.F.R. § 404.1527(d)(2)(i), (ii) (weight accorded to a treating physician's opinion dependent on length of the treatment relationship, frequency of visits, and nature and extent of treatment received). Based on the length of the treatment relationship and Dr. Hnat's experience with plaintiff, Dr. Hnat had the broadest range of knowledge regarding plaintiff's physical condition, which is supported by the treatment records. See 20 C.F.R. § 404.1527(d)(2); see also Lester, 81 F.3d at 833 ("The treating physician's continuing relationship with the claimant makes [her] especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment."). In the ALJ's decision, she stated that Dr. Hnat's opinion "contrasts sharply with and is without substantial support [in] the other evidence of records." [See AR at 22.] The ALJ's only elaboration on this

12

1   reason to reject Dr. Hnat's opinion, however, was that Dr. To opined that plaintiff has the RFC to

2   perform medium work, and that both the state agency physician, and the medical expert who

3   testified at the February 4, 2010, hearing, opined that plaintiff has the RFC to perform light work.

4   [See AR at 22; see also AR at 43, 227-28, 247.]   However, the ALJ failed to point out any

5   independent evidence in the record comprising specific and legitimate reasons for assigning more

6   weight to these physicians' opinions than to Dr. Hnat's opinions.   [See AR at 22.]   Moreover, as

7   neither the state agency physician nor the medical expert examined plaintiff [see AR at 39-43, 53-

8   59, 246-50], their opinions, without more, cannot constitute substantial evidence that justifies the

9   rejection of Dr. Hnat's opinions.   See Ryan, 528 F.3d at 1202 (internal citation omitted).   Thus, the

10  ALJ's rejection of Dr. Hnat's opinions on this basis was improper.   See Orn, 495 F.3d at 632-33;

11  Rollins, 261 F.3d at 856.

12         The ALJ also improperly rejected the opinions of Dr. Dimmick.   First, the ALJ stated that

13  Dr. Dimmick's "one reported contact with [plaintiff] does not equate to a treating relationship ... and

14  therefore, neither controlling weight nor deference need be given."   [AR at 23.]   However, an

15  examining physician, by definition, is a physician who examines but "does not have ... an ongoing

16  treatment relationship with [the claimant]."   See 20 C.F.R. § 404.1502.   Thus, even though Dr.

17  Dimmick's opinion was contradicted by the opinions of Dr. To, the consultative examiner, and the

18  medical expert, the ALJ was still required to offer specific and legitimate reasons supported by

19  substantial evidence in the record to reject it.   See Lester, 81 F.3d at 830-31.   In addition, the

20  ALJ's next reason -- that Dr. Dimmick's "examination of [plaintiff] ... reads like an essentially

21  benign and normal report with the exception of multiple tender areas in the large extensors and

22  flexors of the upper and lower extremities ..." [see AR at 23] -- also was not a legitimate reason

23  to reject Dr. Dimmick's opinion.   As discussed supra, courts have noted that there are no

24  laboratory or diagnostic tests that can verify the presence of fibromyalgia (Benecke, 379 F.3d at

25  590 (internal citations omitted)), and that diagnosis of the disease is instead made by confirming

26  widespread pain with tenderness in at least eleven of eighteen "trigger points" on the body.   See

27  Brosnahan, 336 F.3d at 672 n.1; see also Rollins, 261 F.3d at 855.   Consistent with this method

28  of diagnosis, Dr. Dimmick performed an independent examination of plaintiff, found that she had

"multiple tender areas in the large extensors and flexors of the upper and lower extremities," and diagnosed her with fibromyalgia.  Thus, the ALJ's second reason for rejecting Dr. Dimmick's opinion actually supports, rather than detracts from, his opinion, and the ALJ was not permitted to ignore competent evidence in the record in order to justify her conclusion that the report "reads like [it is] essentially benign and normal."  See Gallant, 753 F.2d at 1456.  Finally, the ALJ stated that Dr. Dimmick "appeared to rely quite heavily on the subjective reports of symptoms and limitations provided by [plaintiff] and to uncritically accept as true most, if not all, of what was alleged."  [AR at 23.]  Insofar as Dr. Dimmick relied on plaintiff's reports of her symptoms in reaching his conclusions, the ALJ improperly discounted plaintiff's credibility concerning the severity of her physical limitations, discussed infra, and thus this also was not a legitimate reason to reject Dr. Dimmick's opinions.

The ALJ did not provide  specific and legitimate reasons supported by substantial evidence to reject the opinions of Dr. Hnat or those of Dr. Dimmick.  Remand is warranted.

**B.     PLAINTIFF'S SUBJECTIVE SYMPTOM TESTIMONY**

Plaintiff contends that the ALJ failed to properly evaluate her subjective symptom testimony.  [JS at 19-21.]

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis."  Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Id. (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may only reject the claimant's testimony about the severity of her symptoms upon (1) finding evidence affirmatively suggesting that the claimant was malingering, or (2) offering specific, clear and convincing reasons for doing so.  See Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1999); see also Lingenfelter, 504 F.3d at 1036; Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  The factors to be considered in weighing a claimant's credibility include: (1) the claimant's reputation for

truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also 20 C.F.R. §§ 404.1529(c), 416.929(c).  If properly supported, the ALJ's credibility determination is entitled to "great deference."  See Green v. Heckler, 803 F.2d 528, 532 (9th Cir. 1986).

Plaintiff testified, in part, that her pain wakes her up at night, and keeps her up from anywhere from 1:30 a.m. to 5:00 a.m. [See AR at 44-45.] She stated that she then tries to sleep for approximately an hour and a half to two hours, "hoping that [she does not] wake up with pain," and later naps throughout the day "due to [her] lack of sleep and the pain that [she is] in." [See AR at 45.] Plaintiff testified that she has pain in her legs and her back, and experiences tingling in her fingers.  [See AR at 47.]  She further testified that she can only sit for 10 to 20 minutes at a time before needing to stand, and can only stand for 10 to 20 minutes at a time before needing to sit down due to pain in her legs, ankles, and back.  [See AR at 47, 49.]  She stated that apart from her naps, she spends about two or three hours throughout the day lying down because of her pain, but acknowledged that there is "no good position" for her to be in.  [See AR at 51.] Plaintiff stated that stress and "overdoing ... a household activity" make the pain worse, to the point where she might spend the rest of the day trying to recover.  [See AR at 47.]  She also testified that she has difficulty concentrating and paying attention, and that she does not "have patience with [herself]" or anyone else.  [See AR at 52.]

At step one of the two-step credibility analysis, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." [See AR at 21.]  The ALJ nevertheless concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they would preclude the [ALJ's RFC findings for plaintiff]."  [Id.]

At step two, the ALJ appeared to find that plaintiff was malingering, citing a July 26, 2008, psychiatric evaluation report by examining psychiatrist Dr. Kent Jordan to conclude that

"examiners have commented as to some embellishment of symptomatology" that, although "in relation to mental functioning, ... nonetheless reflects on [plaintiff's] credibility in terms of her physical pain complaints." [See AR at 22, 229-33.] In his report, Dr. Jordan opined that plaintiff "appeared to embellish psychiatric symptomatology to some extent" because while she reported that she was "emotionally overwhelmed" by the mental evaluation and by her chronic pain, her "emotionally neutral functioning was not impaired by any sustained dysphoric affect" during the evaluation. [See AR at 232-33.] As the ALJ acknowledged, however, Dr. Jordan's report of "some" embellishment was made as to plaintiff's mental functioning, not as to her physical symptoms. [See AR at 22, 229, 232.] This, by itself, was insufficient to establish malingering by plaintiff as to her physical pain and fatigue. See Bowen v. Astrue, 2009 WL 3838322, at *10 (C.D. Cal. Nov. 16, 2009) (where non-treating physician's report that the plaintiff "appeared to significantly embellish symptomatology of the present illness" referenced the plaintiff's alleged depression, the physician's opinion was "insufficient to establish malingering by [the plaintiff] as to her pain and fatigue"). Moreover, there is significant evidence in the record to support plaintiff's allegations concerning the severity of her physical symptoms, as well as her reputation for truthfulness as it relates to her reports concerning those symptoms. First, as discussed supra, Dr. Hnat's physical examinations of plaintiff consistently found her to have positive tenderness at all fibromyalgia tender points, and Dr. Dimmick's findings were similar. Second, nothing in the record affirmatively suggests that plaintiff embellished any of her physical symptoms. Dr. Hnat opined that plaintiff's symptoms and functional limitations were "reasonably consistent" with her impairments of fibromyalgia and cervical spinal stenosis, and that she is not a malingerer. [See AR at 646-48.] Similarly, Dr. Dimmick opined that plaintiff's symptoms and functional limitations were "reasonably consistent" with her impairments of fibromyalgia, rosacea, and hypothyroidism, and that she is not a malingerer. [See AR at 722-23, 727.] In addition, Dr. To opined that plaintiff's reliability is "average," and even Dr. Jordan stated that other than the noted embellishment as to her mental functioning, plaintiff "appeared to be an adequate historian." [See AR at 224, 228-29.] Thus, the evidence in the record does not support a conclusion that plaintiff was malingering as to her physical symptoms, and the ALJ's isolated reference to Dr. Jordan's finding as to plaintiff's

16

1  reports concerning her mental functioning was insufficient to establish such malingering.

2  Therefore, the ALJ was required to offer "specific, clear and convincing reasons" for rejecting her

3  subjective symptom testimony.  See Lingenfelter, 504 F.3d at 1036.  "General findings are

4  insufficient; rather, the ALJ must identify what testimony is not credible and what evidence

5  undermines the claimant's complaints." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998)

6  (quoting Lester, 81 F.3d at 834); see also Dodrill, 12 F.3d at 918.

7        Apart from plaintiff's purported embellishment of her symptoms of mental functioning, the

8  ALJ appeared to reject plaintiff's credibility because: (1) "[a]lthough [plaintiff] alleges the onset of

9  disability since November 30, 2004, a review of the medical records fail[s] to reveal any disorders

10  which would warrant any functional restrictions and/or would otherwise be medically determinable

11  to coincide with that date," and (2) "[plaintiff's] descriptions of her activities throughout the record

12  do not show that she is significantly limited by pain, fatigue or weakness."[8]  [AR at 21-22.]

13        First, the ALJ's argument related to plaintiff's alleged disability onset date was not a clear

14  and convincing reason to completely reject plaintiff's pain testimony.  Citing plaintiff's alleged

15  disability onset date of November 30, 2004, the ALJ discussed medical records showing that

16  plaintiff's migraines, cardiac palpitations, breast pain, symptoms of restless leg syndrome, and

17  symptoms of hypothyroidism were isolated incidents or improved by late 2005, that her

18  fibromyalgia was not diagnosed until 2006, and that she had neck problems that first appeared

19  in 2007.  [See AR at 21-22.]  Plaintiff alleges that the constant and widespread pain in her body

20  began in 2005.  [See AR at 156.]  That plaintiff may not have been disabled for Social Security

21  purposes for an initial period following her alleged disability onset date of November 30, 2004, is

22  not a clear and convincing reason to reject plaintiff's allegations concerning her pain beginning at

23  some point after that date, including those concerning the nature and severity of her fibromyalgia

24  pain, which she alleges began in 2005.  See Lingenfelter, 504 F.3d at 1036.

25  /

26

27  _____

28     [8]   The latter of the two reasons that the ALJ used to discount plaintiff's credibility is discussed by the ALJ in her rejection of Dr. Hnat's opinion.  [See AR at 22.]

1    Second, the ALJ also appeared to discount plaintiff's credibility because her "descriptions

2    of her activities throughout the record do not show that she is significantly limited by pain, fatigue

3    or weakness." [See AR at 22.]  Generally speaking, if a claimant has the ability to perform

4    activities "that involve many of the same physical tasks as a particular type of job, it would not be

5    farfetched for an ALJ to conclude that the claimant's pain does not prevent [her] from working."

6    See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  Engaging in some household chores or

7    activities, however, is not necessarily inconsistent with a finding of disability.  See Gallant, 753

8    F.2d at 1453 (benefits awarded on appeal to a claimant experiencing constant leg and back pain,

9    despite the claimant's ability to cook and wash dishes); see also Cooper v. Bowen, 815 F.2d 557,

10   561 (9th Cir. 1987) (stating that the ability to assist with some household tasks was not

11   determinative of disability) (citing Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) (disability

12   claimant need not "vegetate in a dark room excluded from all forms of human and social activity")).

13   The Court finds that the ALJ's summary of plaintiff's daily activities mischaracterizes most

14   of plaintiff's statements regarding those activities.  First, the ALJ noted that plaintiff "has related

15   that she performs household chores during the day." [AR at 22.]  However, in a Function Report

16   plaintiff completed on March 18, 2008, plaintiff stated that she usually "spread[s] out [her]

17   household chores throughout the week or weeks," and that "[i]t usually takes [her] a couple of

18   hours or the entire day to do one household chore, since it takes all [her] energy and [she is] tired

19   for the rest of the day." [See AR at 159-66.]  Moreover, at the hearing before the ALJ, plaintiff

20   testified that "overdoing ... a household activity" makes the pain worse, such that she might have

21   to spend the rest of the day trying to recover. [See AR at 47.]  Next, the ALJ pointed out that

22   plaintiff "prepares meals" [AR at 22], but plaintiff stated in her Function Report that she prepares

23   "sandwiches, salads, soups, frozen food, [and] meat" [AR at 161], and she testified at the hearing

24   that she "[tries] to do microwaveable cooking, but [her] husband helps [her] with cooking." [AR at

25   48.]  Third, the ALJ relied on the fact that plaintiff "attends to self care in terms of bathing,

26   dressing, etc[.], without assistance." [See AR at 22.]  While this is consistent with plaintiff's

27   statements in her March 18, 2008, Function Report [see AR at 160], plaintiff testified at the hearing

28   that she tries to purchase as many "zip up" items of clothing as possible because "[i]t hurts to pull

over T-shirts" and to button things.  [See AR at 51.]  Finally, the ALJ noted, citing plaintiff's Function Report, that plaintiff "shops for 3 to 4 hours at a time for groceries, personal necessities and household products."  [See AR at 22, 162.]  However, plaintiff stated in the report that she only shops "about once every 2 weeks" and that it takes her 3 to 4 hours "because [she] walk[s] slow[ly]."  [AR at 162.]  She also stated that she will have someone accompany her "to carry the heavy items" or will "ask for store assistance."  [Id.]  Moreover, plaintiff testified at the hearing that she can only stand for 10 to 20 minutes at a time before needing to sit down due to the pain in her legs, ankles, and back.  [See AR at 49.]  Thus, the ALJ's conclusion that plaintiff's "descriptions of her activities throughout the record do not show that she is significantly limited by pain, fatigue or weakness" is a mischaracterization of much of the evidence in the record concerning plaintiff's daily activities.  This was error.  See Gallant, 753 F.2d at 1456 (error for an ALJ to ignore competent evidence in the record in order to justify her conclusion).  Moreover, the Court is not persuaded that plaintiff's ability to bathe, dress, and attend to other matters of personal care supports the ALJ's finding that plaintiff could sustain gainful employment, because the ability to do these limited activities does not necessarily translate into an ability to do activities that are "transferable to a work setting."  See Fair, 885 F.2d at 603 (noting that a claimant is not required to be "utterly incapacitated" in order to be disabled and that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication").  To properly discredit a plaintiff's credibility based on her daily activities, the ALJ must find that plaintiff "is able to spend a *substantial part* of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quoting Morgan v. Comm'r of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)) (emphasis in original).

The ALJ did not provide clear and convincing reasons supported by substantial evidence to discount plaintiff's credibility.  Remand is warranted on this issue.

/

/

**VI.**

**REMAND FOR FURTHER PROCEEDINGS**

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision.  See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984).  In this case, remand is appropriate to properly evaluate Dr. Hnat's opinions, Dr. Dimmick's opinions, and plaintiff's subjective symptom testimony.[9]  The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: February 22, 2012

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[9]   While the Court has considered whether remanding for the award of benefits is appropriate in this case, it declines to exercise its discretion to do so as it is unclear, even if plaintiff were deemed disabled, when her disability began.

20